IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
Western Division (at Cincinnati)

| | | |
|---|---|---|
| **DAN HILS, et al.,** | : | Case No. 1:21-cv-00475 |
| Plaintiffs, | : | |
| v. | : | |
| **GABRIEL DAVIS, et al.,** | : | |
| Defendants. | : | |

### REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION[1]

Plaintiffs, by and through Counsel, provide this Reply in support of their Motions for Temporary Restraining Order and Preliminary Injunction.

**I.    The First Amendment is violated**

Defendants first attempt to distinguish existing case law based on the location where the recording occurs. Before delving into this matter, it is important to note that anyone in Ohio can record a conversation that they are a party to. Ohio Rev. Code § 2933.52. Second, the City ordinances authorizing these investigations provide that the investigatory materials are open to the public.[2] Those same ordinances provide for the City to tape record of interviews. *Id.* at Section 3-F.

The appropriate definition of the right at issue in this case, is the right to record a conversation, itself legal under state law, where someone has a right to be in the first instance.

Freedom of the press, as protected under the First Amendment, "goes beyond protection of the press and the self-expression of individuals to prohibit government from limiting the stock

---

[1] At this juncture, this Motion is best considered a preliminary injunction, as the Defendants have responded.

[2] https://library.municode.com/oh/cincinnati/codes/code_of_ordinances?nodeId=THADCO_ART XXVIIICICOAU (last visited 7/29/2021)

1

of information from which members of the public may draw." *First Nat'l Bank v. Bellotti*, 435 U.S. 765, 783 (1978). The Amendment extends to "news gathering." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972). This, in turn, ensures and enhances, to the maximum extent possible, "free discussion of governmental affairs." *Mills v. Alabama*, 384 U.S. 214, 218 (1966).

As a Michigan federal court recently noted, "[c]ell phone use, especially to document everyday encounters, has become ubiquitous in the twenty-first century." *Craft v. Billingslea*, 459 F. Supp. 3d 890, 910 (EDMI 2020). "The video recording capacity of a cell phone has also improved dramatically over the past decade, and citizens increasingly choose to record interactions they witness or experience with the police." *Id.* "Given these circumstances, as well as the holdings in other Circuits, there now exists a clearly established First Amendment right to openly film police officers carrying out their duties, subject to reasonable restrictions." *Id.*

Further, this Court, in *Crawford v. Geiger*, 131 F. Supp. 3d 703, 715 (SDOH 2015), was clear that the right involved was to "openly to film police officers carrying out their duties in public." But the Court was also clear that what was deemed "public" happened to coincide with the ability, without fear of arrest, to record what one can otherwise lawfully see and hear." *Id.*

Several courts have recognized recording as either expressive conduct warranting First Amendment protection, *Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203-04 (9th Cir. 2018) (finding the creation of an audiovisual recording to be speech because "[t]he act of recording is itself an inherently expressive activity"), or conduct essentially preparatory to speech, *ACLU v. Alvarez*, 679 F.3d 583, 595 (7th Cir. 2012) (emphasis in original) ("The act of making an audio or audiovisual recording is necessarily included within the First Amendment's guarantee of speech . . . as a corollary of the right to disseminate the resulting recording."); *see also Animal Legal Def. Fund v. Herbert*, 263 F.Supp.3d 1193, 1198 (D. Utah 2017) (examining

2

cases and noting that "it appears the consensus among courts is that the act of recording is protectable First Amendment speech.").

Newsgathering, including the right to record the investigative proceedings here, "qualif[ies] for First Amendment protection." *Boddie v. Am. Broad. Cos.*, 881 F.2d 267, 271 (6th Cir. 1989) (*quoting Branzburg*, 408 U.S. 665, 681). "[W]ithout some protection for seeking out the news, freedom of the press could be eviscerated." *Branzburg*, 408 U.S. at 681.

Audio and audiovisual recording are media of expression commonly used for the preservation and dissemination of information and ideas and thus are "included within the free speech and free press guaranty of the First and Fourteenth Amendments." *Burstyn v. Wilson*, 343 U.S. 495, 502 (1952). Moreover, "the First Amendment goes beyond protection of the press and self-expression of individuals to prohibit government from limiting the stock of information from which members of the public may draw." *First Nat'l Bank of Bos. v. Bellotti*, 435 U.S. 765, 783 (1977).

The cases cited by Plaintiffs regarding the right to record are clearly implicated here. And, as explained below, the courthouse and execution recording cases cited by Defendants are inapposite. First, *ACLU v. Alvarez*, 679 F.3d 583 (7th Cir. 2012), observed that the "public" right to record is implicated not merely on the street corner, but instead refers to whether the person doing the recording has a right to be there, and is engaged in speech "audible to persons who witness the events." Id. at 586.

Critical to the discussion in *Alvarez* was whether or not an expectation of privacy was implicated by the conversation at issue. *Id.* at 606. There is no such expectation here: officers subject to the CCA assume everything they say can and will be used against them by the CCA, if

3

not in a court of law, then in the court of public opinion. But the fact that the CCA tape records the interview itself belies any sort of argument that there is any sort of expectation here.

In *Alvarez*, the recording it was "in public," in the sense that there was access by the bystanders doing the recording to the information. So too here. At least in an ideal world where there is not selective recording. The CCA itself is supposed to fully record the interviews themselves, and they are, ultimately, available to the public for release.

Given that First Amendment interests are unquestionably implicated with recording, *Alvarez* explains that there is a balancing that occurs. As in *Alvarez*, observers and participants in the CCA process "may lawfully watch and listen to the … communications …or take shorthand notes and transcribe the conversations or otherwise reconstruct the dialogue later." *Id.* at 606. And there, as here, these observers and officer participants "may post all of this information on the internet or forward it to news outlets," all without violating any requirement here. *Id.*

As was the case in *Alvarez*, the Defendants here have "not identified a substantial governmental interest that is served by banning … recording of these same conversations [that Defendants themselves record.]" *Id.* And there, as here, Plaintiffs "plan [] to record openly, thus giving the police and others notice that they are being recorded." *Id.*

The First Amendment protects the right to gather information about what public officials do on public property (Defendants do not dispute that these interviews occur on public property but claim that these interviews are somehow not public even though they are designed to be released to the public). *See Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir.1994) (finding that plaintiffs' interest in filming public meetings is protected by the First Amendment); *Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir.1995) (recognizing a "First Amendment right to film

4

matters of public interest"); *Lambert v. Polk County*, 723 F. Supp. 128, 133 (S.D.Iowa 1989) ("It is not just news organizations … who have First Amendment rights to make and display videotapes of events…."); *Thompson v. City of Clio*, 765 F. Supp. 1066, 1070-71 (M.D.Ala.1991) (finding that city council's ban on member's attempt to record proceedings regulated conduct protected by the First Amendment); *cf. Williamson v. Mills*, 65 F.3d 155 (11th Cir.1995) (reversing district court's grant of qualified immunity to a law enforcement officer who seized the film of and arrested a participant in a demonstration for photographing undercover officers).

Defendants argue that the public cannot attend CCA interviews – and Plaintiffs do not dispute that contention. However, the public also does not have the right to enter into homes where police activity occurs either. Yet, if officers enter a home, there is no doubt but that the homeowners themselves, who have a right to be there, can record the officers. *Garcia v. Montgomery Cnty.*, 145 F. Supp. 3d 492 (D. Md. 2015) (right to record officers in the home).

Further, while incidental or "time, place, or manner" restrictions on expressive conduct are permissible where supported by a sufficiently important governmental interest, so long as the regulation is justified without reference to the content of the regulated speech, the Defendants here fail to offer any governmental interest fostered by their no-recording policy, much less a sufficiently important one. *City of Renton v. Playtime Theatres, Inc.*, 475 U.S. 41, 47-48 (1986); *Clark v. Community for Creative Non-Violence*, 468 U.S. 288, 293 (1984). *See also United States v. Yonkers Bd. of Educ.*, 747 F.2d 111, 114 (2nd Cir. 1984) (analyzing rule barring newspaper reporter from tape recording civil trial as time, place, and manner restriction). The requirement of content-neutrality is particularly important where, as in this case, government

operates "at the core of the First Amendment" by regulating speech that is "political" or that touches on "public issues." *See Boos v. Barry*, 485 U.S. 312, 317 (1988).

In yet another case, the Third Circuit explained in *Fields v. City of Philadelphia*, 862 F.3d 353, 359 (3d Cir. 2017) that recordings of police activity (which this case unquestionably involves) is "ubiquitous," and that such interactions "have both exposed police misconduct and exonerated officers from errant charges." *Id.* at 355. As the Court noted, "[t]here is no practical difference between allowing police to prevent people from taking recordings and actually banning the possession or distribution of them." *Id.* at 358. *See, also, Garrison v. Louisiana*, 379 U.S. 64, 77 (1964) (recognizing the "paramount public interest in a free flow of information to the people concerning public officials, their servants"). Indeed, "[t]o record what there is the right for the eye to see or the ear to hear corroborates or lays aside subjective impressions for objective facts." 862 F.3d 353, 359. "Hence to record is to see and hear more accurately." *Id.* "Recordings also facilitate discussion because of the ease in which they can be widely distributed via different forms of media." *Id.* And *Fields*, too, examined the interests proffered by the government entity and determined they were insufficient. *Turner v. Driver*, 848 F.3d 678 (5th Cir. 2017) reaches the same conclusion.

What, pray tell, is the governmental interest here in preventing recording by officers or their representatives? Is it to hide from the public the truth about what occurs in selectively recorded interviews? Is it to hide material evidence from an investigative process the public is supposed to trust? Is it ensuring that only the CCA can have the recorded story about what exactly happened in the interview – in a public process – for later manipulation?

The Defendants do not tell us what exactly their policy is supposed to foster, particularly where they, themselves, record the interviews. And, after all, the officers themselves are free to speak about what happened in these interviews, and there is no big secret involved.

Nor is this case a courthouse recording case, such as the one cited by Defendants, where witnesses and jurors must be protected and administration of justice concerns that are paramount. Here, everyone knows who the officers are that are involved, and, unless the CCA is manipulating the interview recordings like they have done recently, those interviews will eventually reach the public. The proffered governmental interests at stake in a court proceeding are simply not applicable here. Nor is this case equivalent to a right to video an execution case, where, again, the Court discussed various substantial governmental interests involving the safety and security of the prison that would make the policy reasonable.

Again: Defendants do not tell us what governmental interests are advanced here by their no-recording policy. And we submit that the proffered reason for the very existence CCA, namely to conduct fair and impartial investigations that the public can trust, is actually undermined by this policy.

Defendants next take a different tact, and offer this court a red herring: they claim that the presence of Plaintiff in the interviews is due to their employment – and this is true enough. But this is not an access case: and there is no question that the First Amendment would not give unfettered public access to the CCA interviews. The point is that Plaintiffs have to go to CCA interviews, and, while there, they have the right to record absent the City putting forth some compelling interest in their not doing so (which the City has not done)[3].

---

[3] Attached hereto as Exhibit 1 is the Advice of Rights form given to police officers when they appear to be questioned by the CCA. That form specifically states "You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of Ohio and the Constitution of the United States…".

The Defendants next argue that the policy is viewpoint neutral and reasonable. It certainly is neither. Some people, the CCA interviewers, are permitted to record interviews, and apparently selectively record these interviews at that – while the officers subject to the interviews are not. This is neither viewpoint neutral, nor reasonable. Again: this is not a courthouse case with the interests at stake in such a matter.

The Defendants finally argue that as employees, *Pickering v. Bd. Of Educ. Of Twp. High Sch. Dist., 205, Will. Cty.*, 391 U.S. 563, 568 (1968) applies. To begin, *Pickering* deals with freedom of speech, not freedom of the press, and most right to record cases are rooted in the latter rather than the former. Perhaps for good reason. When one considers the purpose and intent of recording, including for release to the public and media, it becomes clear that speech restrictions that employees can, in some circumstances, be subject to are wholly inapplicable.

But even taking *Pickering* as applicable, and looking to *Garcetti v. Ceballos*, 547 U.S. 410 (2006), the appearance of the officers (but not Plaintiff Hils) at the CCA was unquestionably part of the employees' official duties. Plaintiff Hils did not appear pursuant to his duties with the City. What was not part of the employees' duties, and where the Defendants' analysis falls far short, is that the claims at issue have nothing to do with being forced to give statements to the CCA. Clearly, Defendants can compel officers to do so.

But under what ordinance or official duty are Plaintiffs required to record those interviews? To ask the question is to answer it, because clearly, the CCA prevented that very recording. In other words, there was no employee job duty to engage in the speech (or preparation for speech) in question: audio and video recording of these interviews. And what speech were Plaintiffs preparing to engage in? The verified complaint tells us: "a desire for complete and open transparency concerning policing in the City of Cincinnati – a desire to

record, for posterity, possibly defensively, and possibly for release to conventional and non-conventional media." (Pl.'s Verified Compl. at ¶15).

What job duties were involved in release of such interview tapes to conventional and non-conventional media? Again, to ask this question is to answer it.

The speech (specifically the recording and later release), and preparations for speech (the recordings to prepare for a public release), are clearly citizen employee speech.

Next, does the speech touch upon areas of public concern? Clearly, for Plaintiff Hils, the answer is yes. *See Cook v. Gwinnett County Sch. Dist.*, 414 F.3d 1313, 1319 (11th Cir. 2005) (holding that a union president's recruiting of fellow bus drivers to join the union touched on a matter of public concern because she did so "to improve a variety of conditions, not only for herself individually, but rather for the collective welfare of her fellow drivers"); *Clue v. Johnson*, 179 F.3d 57, 61 (2d Cir. 1999) (holding that "activities on behalf of a union faction that necessarily entail a substantial criticism of management raise matters of public concern under Connick"); *Gregorich v. Lund*, 54 F.3d 410, 416 (7th Cir. 1995) (holding that a research attorney's "attempt to obtain representation for all research attorneys in the Fourth District went beyond his self-interest" and made his activity a matter of public concern).

But the answer is also yes for the individual officers as well. Releasing their statements, particularly in the event of any release by a partially recorded, doctored recording by the CCA also touches on core issues of public concern. The City's own ordinances demonstrate the critical importance that the CCA "be perceived as fair and impartial," and that it release reports to the public. City Ordinances Article XXVIII. CCA manipulation of officer interviews, and proof of the CCA doing so, goes to the heart of matters of public concern.

9

What is perhaps shocking, but not surprising, is that the City does not refute the factual allegations in the Complaint with a affidavit that might somehow create an issue of fact about the material allegations in the verified Complaint: namely that the CCA had manipulated at least one recording that gave rise to serious concerns by Plaintiffs here about creating a false narrative and report to the public. (Pl.'s Verified Compl. at ¶¶ 13-14).

What does this tell the Court? That the allegations are unquestionably true. There is not even a dispute of fact about them.

What could be of greater public concern than a watchdog agency for Cincinnati police manipulating a false narrative about citizen and police encounters in the City of Cincinnati, at a time when police officers are under increasing scrutiny? Again, to ask the question is to answer it. The speech at issue: recording a truthful narrative to ultimately expose to the public the corrupt practices within the CCA, is at the core of public concern.

Where, as is the case here, there is an implemented policy that involves not merely an individual employee, but instead a pattern and practice, the third prong balancing test in *Pickering* is significantly lessened and traditional First Amendment analysis applies. The U.S. Supreme Court told us as much just a few years ago. *Janus v. AFSCME, Council 31*, 138 S. Ct. 2448, 2472 (2018). There, the Court began by explaining that "[f]irst, the Pickering framework was developed for use in a very different context—in cases that involve 'one employee's speech and its impact on that employee's public responsibilities.'" *Id., citing United States v. Treasury Employees*, 513 U. S. 454, 467 (1995). "This case, by contrast, involves a blanket requirement …" *Id.* "While we have sometimes looked to *Pickering* in considering general rules that affect broad categories of employees, we have acknowledged that the standard *Pickering* analysis requires modification in that situation." *Id.* "A speech-restrictive law with 'widespread impact,'

we have said, 'gives rise to far more serious concerns than could any single supervisory decision.'" *Id.* "Therefore, when such a law is at issue, the government must shoulder a correspondingly 'heav[ier]' burden … and is entitled to considerably less deference in its assessment that a predicted harm justifies a particular impingement on First Amendment rights, …. The end product of those adjustments is a test that more closely resembles exacting scrutiny than the traditional *Pickering* analysis."

So too here.

And, again, what governmental interest, exactly, is served by the Defendants no recording policy? They do not tell us. And so even if a traditional balancing applied, the fact that the Defendants have articulated no governmental interest that might support their blanket ban on recordings, compels a finding that engaging in a *Pickering* balancing does not prevent the claims here.

**II.  No state law, including collective bargaining laws, can preempt or override the United States Constitution or the federal laws implementing it.**

Defendants next contend that this matter is really a collective bargaining issue, and that SERB has exclusive jurisdiction over this matter. One might begin by responding that the federal rights at issue here are independent of any contractual or bargaining rights, and thus are outside SERB's jurisdiction as a matter of state law. *Franklin Cty. Law Enforcement Assn. v. Fraternal Order of Police, Capital City Lodge 9*, 59 Ohio St.3d 167 (1991) at syllabus, ¶2. But more fundamentally, even if the Defendants were perfectly correct that SERB had exclusive jurisdiction as a matter of state law, that state law cannot preempt federal law.

Article VI of the United States Constitution provides:

> This Constitution, and the laws of the United States which shall be made in pursuance thereof; and all treaties made, or which shall be made, under the authority of the United

11

States, shall be the supreme law of the land; and the judges in every state shall be bound thereby, anything in the Constitution or laws of any State to the contrary notwithstanding.

As it turns out, the United States Supreme Court has expressly considered whether or not state immunity or jurisdictional statutes can provide save harbor from federal law, implementing and vindicating federal Constitutional rights. *Haywood v. Drown*, 556 U.S. 729 (2009). And, not surprisingly as the plain text of Article VI makes clear, the answer is no. *Id.*

If Defendants are correct about their interpretation of state law concerning SERB, then, as was the case in *Haywood*, there would be a state law that divests courts of jurisdiction over these claims. *Id.* at 731. There, as here, there was an argument that a separate forum was created for the action. *Id.* at 734. The observations in *Haywood* are equally applicable here: "although States retain substantial leeway to establish the contours of their judicial systems, they lack authority to nullify a federal right or cause of action they believe is inconsistent with their local policies." *Id.* at 736. "The State's policy, whatever its merits, is contrary to Congress' judgment that all persons who violate federal rights while acting under color of state law shall be held liable [under 42 USC 1983]." *Id.* at 736-737. Indeed, "[a] jurisdictional rule cannot be used as a device to undermine federal law, no matter how evenhanded it may appear." *Id.* at 739.

It is clear that a valid federal law is substantively superior to a state law; "if a state measure conflicts with a federal requirement, the state provision must give way." *Swift & Co. v. Wickham*, 382 U.S. 111, 120 (1965).

The text of 42 U.S.C. 1983 is clear: "Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or

other proper proceeding for redress." Defendants cannot avoid its import by invoking a state employment law.

### III. The remaining injunction factors favor an injunction here

Sixth Circuit precedent establishes that the remaining factors are met where constitutional rights are infringed upon and a government actor is the Defendant. *H.D.V. Greektown, LLC v. City of Detroit*, 568 F.3d 609 (6th Cir. 2009) (abuse of discretion not to grant preliminary injunction where constitutional violation found); *Roberts v. Neace*, 958 F.3d 409 (6th Cir. 2020); *Maryville Baptist Church, Inc. v. Beshear*, 957 F.3d 610 (6th Cir. 2020); *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (irreparable harm from violation of rights); *G & V Lounge v. Mich. Liquor Control Comm'n*, 23 F.3d 1071, 1079 (6th Cir. 1999) ("[I]t is always in the public interest to prevent the violation of a party's constitutional rights.").

### IV. Conclusion

An injunction should issue here.

        Respectfully Submitted,

        /s/Zachary Gottesman
        Zachary Gottesman (0058675)
        Gottesman & Associates, LLC
        404 East 12th Street, First Floor
        Cincinnati, Ohio 45202
        513/651-2121
        zg@zgottesmanlaw.com

        /s/ Christopher Wiest
        Christopher Wiest (OH 0077931)
        Chris Wiest, Atty at Law, PLLC
        25 Town Center Blvd, Suite 104
        Crestview Hills, KY 41017
        513/257-1895 (c)
        chris@cwiestlaw.com

**CERTIFICATE OF SERVICE**

      I hereby certify that on August 2, 2021, the foregoing was filed with the Clerk of Courts using the CM/ECF system which will automatically provide notice of its filing to all counsel of record.

                                        */s/Zachary Gottesman*
                                        Zachary Gottesman (0058675)

Exhibit 1

## ADVICE OF RIGHTS

I wish to advise you that you are being questioned as part of an official City of Cincinnati administrative investigation conducted by the Citizen Complaint Authority (CCA). You will be asked questions that are specifically directed and narrowly related to the performance of your official duties or fitness for office. This is not a criminal investigation. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of Ohio and the Constitution of the United States, including the right not to be compelled to incriminate yourself.

I wish to advise you that if you refuse to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges, which could result in your dismissal from employment with the City of Cincinnati, subject to appropriate appeals. Since this is an administrative matter and any self-incriminating information you may disclose will not be used against you in a court of law, in accordance with Garrity v. New Jersey (1967), 385 U.S. 493, City employees must respond completely and truthfully to all questions that are specifically, directly and narrowly related to their performance as a City employee. If you do answer, neither your statements, nor any information or evidence which is gained by reason of such statements, may be used against you in any subsequent criminal proceeding as stated in Garrity. However, these statements may be used against you in relation to subsequent departmental charges.

I also wish to advise you that you have the right to have an attorney or union representative present during the interview.

I have reviewed the Advice of Rights prior to the CCA interview.

_Ken L. Byrne (P5195)_  7-15-21
Signature of City Employee        Date

KEN L. BYRNE
Print Name

J. Batista        7/815/2021
Signature of Interviewer        Date

---

**Receipt of Interview**

☐ _KLB_  I have received a copy of my interview.
  Initial

☐ ____  I do not wish to receive a copy of my interview.
  Initial

_Ken L. Byrne (P5195)_    7-15-21
Signature of City Employee        Date

# ADVICE OF RIGHTS

I wish to advise you that you are being questioned as part of an official City of Cincinnati administrative investigation conducted by the Citizen Complaint Authority (CCA). You will be asked questions that are specifically directed and narrowly related to the performance of your official duties or fitness for office. This is not a criminal investigation. You are entitled to all the rights and privileges guaranteed by the laws and the Constitution of Ohio and the Constitution of the United States, including the right not to be compelled to incriminate yourself.

I wish to advise you that if you refuse to answer questions relating to the performance of your official duties or fitness for duty, you will be subject to departmental charges, which could result in your dismissal from employment with the City of Cincinnati, subject to appropriate appeals. Since this is an administrative matter and any self-incriminating information you may disclose will not be used against you in a court of law, in accordance with Garrity v. New Jersey (1967), 385 U.S. 493, City employees must respond completely and truthfully to all questions that are specifically, directly and narrowly related to their performance as a City employee. If you do answer, neither your statements, nor any information or evidence which is gained by reason of such statements, may be used against you in any subsequent criminal proceeding as stated in Garrity. However, these statements may be used against you in relation to subsequent departmental charges.

I also wish to advise you that you have the right to have an attorney or union representative present during the interview.

I have reviewed the Advice of Rights prior to the CCA interview.

_____  _____
Signature of City Employee        Date  7-15-21

ADARRYL BIRCH P108
Print Name

_____  _____
Signature of Interviewer          Date  7/15/2021

**Receipt of Interview**

€  _BB_  I have received a copy of my interview.
   Initial

€  ____  I do not wish to receive a copy of my interview.
   Initial

_____  _____
Signature of City Employee        Date  7-15-21