# UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Deborah S. Hunt
Clerk

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: November 07, 2022

Mr. Thomas Bernard Bruns
Bruns, Connell, Vollmar & Armstrong
4555 Lake Forest Drive
Suite 330
Cincinnati, OH 45242

Ms. Lauren Ann Creditt Mai
Mr. Scott Matthew Heenan
Ms. Emily Elizabeth Woerner
City of Cincinnati Law Department
801 Plum Street
Suite 214
Cincinnati, OH 45202

Mr. Zachary Gottesman
Gottesman & Associates
404 E. 12th Street
First Floor
Cincinnati, OH 45202

Mr. Christopher David Wiest
Law Office
25 Town Center Boulevard
Suite 104
Crestview Hills, KY 41017

Re: Case No. 22-3224, *Daniel Hils, et al v. Gabriel Davis, et al*
Originating Case No. : 1:21-cv-00475

Dear Counsel,

The court today announced its decision in the above-styled case.

    Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

                                                Yours very truly,

                                                Deborah S. Hunt, Clerk

                                                Cathryn Lovely
                                                Deputy Clerk

cc:  Mr. Richard W. Nagel

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 22a0235p.06

# UNITED STATES COURT OF APPEALS

FOR THE SIXTH CIRCUIT

---

DANIEL HILS; CHARLES KNAPP; KEN BYRNE; ADARRYL BURCH,

    *Plaintiffs-Appellants*,

*v.*

GABRIEL DAVIS, Director, City of Cincinnati Citizen Complaint Authority and IKECHUKWU EKEKE, Investigator, City of Cincinnati Citizen Complaint Authority, in their official and individual capacities; CITY OF CINCINNATI,

    *Defendants-Appellees*.

No. 22-3224

---

Appeal from the United States District Court for the Southern District of Ohio at Cincinnati.
No. 1:21-cv-00475—Michael R. Barrett, District Judge.

Argued: October 25, 2022

Decided and Filed: November 7, 2022

Before: SUTTON, Chief Judge; DONALD and MURPHY, Circuit Judges.

---

### COUNSEL

**ARGUED:** Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, for Appellants. Scott M. Heenan, CITY OF CINCINNATI, Cincinnati, Ohio, for Appellees. **ON BRIEF:** Christopher Wiest, CHRIS WIEST, ATTY AT LAW, PLLC, Crestview Hills, Kentucky, Thomas Bruns, BRUNS CONNELL VOLMAR ARMSTRONG, Cincinnati, Ohio, Zachary Gottesman, GOTTESMAN & ASSOCIATES, LLC, Cincinnati, Ohio, for Appellants. Scott M. Heenan, Lauren Creditt Mai, CITY OF CINCINNATI, Cincinnati, Ohio, for Appellees.

No. 22-3224  *Hils, et al. v. Davis, et al.*  Page 2

---

**OPINION**

---

SUTTON, Chief Judge. Does the First (and Fourteenth) Amendment give police officers and their union representatives the right to record or videotape interviews conducted in the course of a city's investigation into police misconduct? No, as the district court correctly concluded.

I.

If residents of Cincinnati witness police misconduct, they may lodge complaints with the City's Citizen Complaint Authority. The Authority consists of a team of investigators, an executive director appointed by the city manager, and a seven-person Board appointed by the mayor. Cincinnati Municipal Code art. XXVII, § 2. In response to a complaint, the Authority conducts an investigation that usually includes interviews of the relevant officers, any complainants, and any other witnesses. *See id.* §§ 2, 2-B, 3-A, 3-B, 3-F. The officers, as a condition of employment, are required to participate in such investigations and to "provide truthful and accurate information" to the Authority. R.1 ¶ 11. If the Authority interviews an officer, he or she may bring a representative from the union—in this case Sergeant Daniel Hils, the President of Fraternal Order of Police Lodge 69—to the interview. The Authority video records the interviews. After the Authority finishes the investigation, it prepares findings and recommendations for the Board's review. The Board then holds a hearing and approves or rejects the findings and recommendations. *See* Cincinnati Municipal Code art. XXVII, §§ 3-C, 3-D. The report later becomes available to the public. *Id.* §§ 3-E, 3-F, 5.

In the summer of 2021, Hils claims that he observed troubling behavior with respect to some of the Authority's investigations. He alleges that Investigator Ikechukwu Ekeke, in recording an officer's interview during an investigation, selectively turned off the recording when the officer made exculpatory statements. Another time, he alleges, Ekeke "threatened" an officer before the interview. R.1 ¶ 14.

Hils decided to make his own recordings of the interviews, which he planned to keep and, if appropriate, share with others. In July 2021, he tried to record an interview of Officer Charles

Knapp, whom he represented. The Authority investigator asked Hils to stop, Officer Knapp refused, and the investigator ended the interview. A day later, Ekeke, along with the Director of the Authority, Gabriel Davis, formally put in place a policy that prohibits officers or their representatives from recording the interviews. If an officer refuses to stop the recording, the Authority reserves the right to end the interview and, if need be, to complete the investigation without it. The Authority enforced the policy that same day when Hils tried to record interviews of two officers he represented, Ken Byrne and Adarryl Burch.

Hils and three affected officers sued Ekeke, Davis, and the City of Cincinnati for violating their free-speech rights. Hils and the officers sought damages and declaratory and injunctive relief under § 1983. The Fraternal Order of Police Lodge 69, meanwhile, filed an unfair labor practices charge against the City arising from the same conduct. This charge led to a partial settlement agreement, in which the City agreed to record all interviews all of the time going forward.

The district court eventually rejected all of the federal claims as a matter of law. It reasoned that the settlement agreement mooted the selective-recording claims. As to the no-private-recording policy still in place, the court ruled that the First Amendment does not include a right to record a government investigation. Hils and the affected officers appeal.

## II.

One question dominates all others in this case. Does the First (and Fourteenth) Amendment give police officers and their representatives a right to record internal interviews of them during a governmental investigation into alleged police misconduct? We think not. While there are many potential ways to think about this claim, none of them provides a cognizable basis for relief.

Start with the text of the First Amendment. The relevant language—guaranteeing "freedom of speech, or of the press"—does not by itself cover this conduct. U.S. Const. amend. I. A prohibition on recording speech is not a prohibition on speaking. The union representative, Hils, indeed freely spoke about the City's recording policy and made some headway in changing it. Based on his objections as well as the unfair labor practices charge, the City of Cincinnati changed part of its policy, requiring investigators to record all of the interviews, not bits and pieces of them. Nor may Hils or the officers seek protection, at least as a textual matter, as members of the press,

or as individuals engaged in any such activity.  They have not shown that they operate a "press," that they engage in such activity, or that they otherwise fall within any special Press Clause protections.

History and tradition do not help the claimants either.  *See McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 341–42 (1995) (relying on history and tradition to determine the contours of the free-speech guarantee); *Press-Enter. Co. v. Superior Ct. (Press-Enter. II)*, 478 U.S. 1, 8–9 (1986) (same); *Globe Newspaper Co. v. Superior Ct.*, 457 U.S. 596, 605–06 (1982) (same); *cf. Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 446 (2015) (similar).  We know of no American tradition, whether under federal or state law, by which the subjects of a governmental investigation have a right to record all interviews and other fact-gathering efforts in the course of pending investigations of their alleged misconduct—or, for that matter, the corollary right to make the recordings or videotapes public before the investigation ends.

Hils and the officers do not identify any tradition of opening similar investigations to the public—through releases of videotapes of interviews—in the midst of an investigation.  If anything, our traditions cut the other way.  Plenty of areas of government factfinding and deliberation—grand juries, jury and court deliberations, police and FBI interviews of subjects of interest—do not allow private recordings of the events.  We customarily look to the elected branches—and the state or federal ballot boxes—to permit such access.  Over the last several decades, notably, these venues have not been reluctant to permit *some* access to government information.  A brief survey of the public-record statutes of the States in our circuit alone shows plenty of access-enabling laws.  *E.g.*, Ky. Rev. Stat. Ann. § 61.872; Mich. Comp. Laws § 15.231 *et seq.*; Ohio Rev. Code Ann. § 149.43; Tenn. Code Ann. § 10-7-506.  But those laws do not apply here and do not help the claimants in the context of an ongoing investigation.

One risk of permitting the release of, say, a videotaped interview in the midst of an investigation ought to resonate with the claimants.  It's the risk that only part of the interview will be shared with the media or that the media will use only part of the video during the nightly news.  If it is unfair to an officer charged with misconduct to turn a recording on and off during an interview of him, it is equally unfair to the integrity of the investigation and the objective of public

confidence in it to share bits and pieces of the investigation with the public before the full investigation ends.

Precedent does not support this claim either. As is often the case, however, the explanation requires more elaboration. Several features of the case law in this area deserve note, one partly helpful to the claimants in broadening protection, the rest not helpful to them.

The helpful point is that the Supreme Court has construed the freedom of the press to include a right of access to information and has extended this right to non-journalists in a few settings. "[W]ithout some protection for seeking out the news," the Supreme Court has said, "freedom of the press could be eviscerated." *Branzburg v. Hayes*, 408 U.S. 665, 681 (1972); *see Pell v. Procunier*, 417 U.S. 817, 834 (1974). At least seven justices in *Houchins v. KQED* agreed that the First Amendment protects the "right to gather news 'from any source by means within the law.'" 438 U.S. 1, 11 (1978) (quoting *Branzburg*, 408 U.S. at 681–82); *id.* at 16 (Stewart, J., concurring); *id.* at 30–32 (Stevens, J., dissenting). The Court's cases about the right to access public criminal proceedings, hearings, and trials, moreover, frequently refer to the "press and public," not just the right of the press. *E.g.*, *Waller v. Georgia*, 467 U.S. 39, 44 (1984) ("In several recent cases, the Court found that the press and public have a qualified First Amendment right to attend a criminal trial."); *Press-Enter. II*, 478 U.S. at 7 ("[T]he right asserted here [to access a preliminary criminal hearing] is that of the public under the First Amendment."). Consistent with these cases, our court has recognized a general First Amendment right to gather information in public settings. *Boddie v. Am. Broad. Cos., Inc.*, 881 F.2d 267, 271 (6th Cir. 1989); *cf. S.H.A.R.K. v. Metro Parks Serving Summit Cnty.*, 499 F.3d 553, 560–63 (6th Cir. 2007) (rejecting First Amendment right to hide cameras in a public park after hours to record a deer-culling operation).

Helpful though this principle may be to the claimants in the abstract, it does not help them in the concrete given the limited settings in which it applies. A right to gather information does not require others to give it away or require governments to open up all ongoing proceedings to the public. The First Amendment does not guarantee "the press a constitutional right of special access to information not available to the public generally." *Branzburg*, 408 U.S. at 684; *see also Pell*, 417 U.S. at 833. The Constitution simply does not impose a duty on governments to provide sources of information not available to members of the public. *Pell*, 417 U.S. at 834; *Branzburg*,

408 U.S. at 684. A modest exception exists when the government excludes the people from a space historically open to them, and that space has "play[ed] a particularly significant role in the functioning of the judicial process and the government as a whole." *Globe Newspaper*, 457 U.S. at 605–06 (right to access criminal trials); *see also Press-Enter. II*, 478 U.S. at 8–9.

More specifically and less generally, the Supreme Court in case after case has recognized the power of federal and state governments to close and open doors to sensitive information within their control. The Court upheld government restrictions on the right to travel to Cuba despite its effect on the flow of information about U.S. government policies abroad. *Zemel v. Rusk*, 381 U.S. 1, 16–17 (1965). It upheld a California law barring the press and media from interviews with specific inmates. *Pell*, 417 U.S. at 819, 835. And it held that a county sheriff could restrict newspaper access to a county jail in areas that he had not opened up to public view. *Houchins*, 438 U.S. at 3–4, 16 (plurality); *id.* at 18 (Stewart, J., concurring). The *Houchins* plurality saw "no basis for reading into the Constitution a right of the public or the media to enter these institutions, with camera equipment, and take moving and still pictures of inmates for broadcast purposes." *Id.* at 9. So too for the concurrence: "The Constitution does no more than assure the public and the press equal access once government has opened its doors." *Id.* at 16 (Stewart, J., concurring). That explains why the free-speech and free-press guarantees do not override access restrictions to the White House, *Zemel*, 381 U.S. at 17, or to Supreme Court conferences, grand jury investigations, official governmental meetings, or crime scenes, *Branzburg*, 408 U.S. at 684–85. When all is said and done, the First Amendment right to gather information from the government usually extends as far as the government has opened its doors to the public and press. It thus includes a right to collect information within government control that is currently public or, perhaps in discrete settings not shown here, that the government has made public historically.

That leads to another way to think about this claim—that the officers' appearance at the interviews amounts to a legitimate condition of employment. The claimants acknowledge that the officers' "official duties" include an obligation to participate in investigations by the Authority of alleged police misconduct. Appellants' Br. 38. That makes the interviews, whether from the perspective of the Authority or the officer, a function of government—and the government's speech, not the officers' speech. *Garcetti v. Ceballos* teaches that governments may impose limits

on the way employees carry out their official duties without violating the First Amendment. 547 U.S. 410, 420–22 (2006). So long as the employee is performing an official duty, the government may direct and control his or her speech. *Id.* at 421. For First Amendment purposes, as opposed to, say, Fifth Amendment purposes, the government may not only control the message of its administration but also may control what employees can and cannot say on the job. *Id.* at 421–22. "When government speaks, it is not barred by the Free Speech Clause from determining the content of what it says." *Walker v. Tex. Div., Sons of Confederate Veterans, Inc.*, 576 U.S. 200, 207 (2015). Thus, if the speech at issue is government speech, all we ask is whether the no-recording policy rationally furthers a legitimate government interest. *Cf. Neinast v. Bd. of Trs. of Columbus Metro. Libr.*, 346 F.3d 585, 592 (6th Cir. 2003).

That leaves one last possibility—that we should look at this claim through the lens of whether the Authority's investigation occurs in a public forum or nonpublic forum. At stake is whether the "[p]ublic property" is or is "not by tradition or designation a forum for public communication." *Perry Educ. Ass'n v. Perry Loc. Educators' Ass'n*, 460 U.S. 37, 46 (1983). In "places which by long tradition or by government fiat have been devoted to assembly and debate," such as "streets and parks," the government "may not prohibit all communicative activity." *Id.* at 45. If the speech occurs in a nonpublic forum, by contrast, we ask only whether any restrictions on speech are reasonable, allowing both speaker-based and subject matter restrictions so long as the restriction is viewpoint neutral. *Id.* at 49; *Cornelius v. NAACP Legal Def. & Educ. Fund, Inc.*, 473 U.S. 788, 806 (1985). The claimants offer no argument that a government investigation—or more precisely a government investigation room—amounts to a public forum, if indeed it amounts to a forum at all. Just as the government reserves the polling place for the limited purpose of voting, *Minn. Voters All. v. Mansky*, 138 S. Ct. 1876, 1885–86 (2018), the City restricts access to these interviews for investigatory purposes. One thoughtful scholar, for what it is worth, views the government-speech approach of *Garcetti* as "a doctrinal island" and would assess public employee speech cases primarily under the public or nonpublic forum analysis. *See* Randy J. Kozel, *Government Employee Speech and Forum Analysis*, 1 J. Free Speech L. 579, 599 (2022).

Gauged by these principles, possibilities, and illustrations, the claimants' argument fails. The City's desire to prevent recordings of government investigations during an ongoing investigation does not violate the First Amendment. In the case of an interview of a police officer, the City of Cincinnati permits only a few interested parties into the Authority's investigative interviews: the Authority's members, the police officer, and his or her union representative. It has decided, quite fairly, not to open these interviews into allegations of police misconduct to the public, and one would expect the officers and their union representative to appreciate why. Hils and the officers may wish to record the interviews for "posterity" and "possibly" to "release" them "to conventional and non-conventional media." R.1 ¶ 15. But the premise of permitting recordings is that they are *public* proceedings—and it is the rare governmental entity that conducts the investigative stage of a civil or criminal matter in public. The reasons need not always turn on secrecy; they can turn on maintaining operational order too. Take this case, in which Hils and the officers seek not just to obtain audio recordings, but video recordings as well. It's not hard to envision problems that could arise from giving subjects of an investigation the same rights as the investigators. Perhaps indeed better rights. Admonitions about pictures and words apply tenfold to videotapes—and considerably more to partial video clips. Yet under the claimants' view, they would have the right to release favorable video clips on the evening news or social media sites, all before the investigation ends. That is not a recipe for a productive and fair investigation into police misconduct.

The City's policy also satisfies rational-basis review. *Neinast*, 346 F.3d at 592. The Authority has legitimate interests in maintaining order and fairness during its interviews by ensuring the ongoing interviews are not selectively broadcasted, by ensuring the integrity of the investigation, by protecting the subjects of the investigation from unfair and precipitous public criticism, and by trying to prevent other subjects of the investigation from knowing all that was said in prior interviews. Limiting each officer's ability to record the interview is rationally related to achieving those interests.

It is true that a union representative, such as Hils, is not an employee of the City. But that does not matter. In this setting, he, like an attorney, would be an agent of the employee and thus limited by any restrictions imposed on the principal, the officer. Because the First Amendment

does not give the employees the right to record these interviews, they cannot sidestep this restriction merely by bringing a union representative or an attorney to the interview.

Hils and the officers challenge this conclusion in several ways, but each comes up short.

They claim that cases from our sister circuits come out differently. But that overstates. Not one of the cases concerns a right to record internal government proceedings or to compel public and media access to information during an ongoing investigation. *See Blackston v. Alabama*, 30 F.3d 117, 120 (11th Cir. 1994) (per curiam) (right to record public committee meeting); *Glik v. Cunniffe*, 655 F.3d 78, 79, 82–83 (1st Cir. 2011) (right to record public actions of police); *ACLU v. Alvarez*, 679 F.3d 583, 606 (7th Cir. 2012) (same); *Turner v. Lieutenant Driver*, 848 F.3d 678, 688–90 (5th Cir. 2017) (same); *Fields v. City of Philadelphia*, 862 F.3d 353, 360 (3d Cir. 2017) (same); *see also Animal Legal Def. Fund v. Wasden*, 878 F.3d 1184, 1203–05 (9th Cir. 2018) (striking down a law that prohibited recordings of private agricultural production facilities as an impermissible content-based regulation); *Chestnut v. Wallace*, 947 F.3d 1085, 1090 (8th Cir. 2020) (right to observe police in public).

What about the reality, the claimants point out, that they would have the right to record a police officer who enters their home during the execution of a warrant and that would be true even if the public did not have an equivalent right? The question answers itself. Homeowners have a right to be in their home. Other individuals do not. What a citizen may do under his roof does not tell us what he may do under the government's roof or indeed what he is permitted to do once there. Just as the public does not have a right to accompany the police when they question a suspect at the local police station, they do not have a right to accompany the police when they execute a warrant at an individual's home.

*Butterworth v. Smith* does not help the claimants either. 494 U.S. 624 (1990). A Florida statute prohibited a grand jury witness from disclosing any of his testimony after the grand jury ended. *Id.* at 626. In prohibiting the State from enforcing this prohibition on free speech grounds, the Court reasoned that, once the investigation had ended, so too did the State's interests in keeping information from the targeted individual. At that point, other interests, such as preventing subornation of the grand jury, could be protected by other state laws. *Id.* at 632–33. *Butterworth*

is one sizeable step removed from this case. It concerns the rights of an individual to speak after a secret proceeding has ended, not a right to welcome the public, as there, into the grand jury itself or to welcome the public, as here, into an investigation room while the proceedings remain closed to the public.

Because the Authority's reports and files eventually will become public, the claimants persist, the City's only interest in a no-recording policy is to hide doctored recordings. But just because the reports and files eventually may become public does not mean that the City lacks a legitimate interest in maintaining control over the interview *during* the investigation. Other mechanisms exist for dealing with the risk of doctored interviews after a report becomes public, most notably the reality that the officer and Hils can say as much and Hils can use his notes to show as much.

Hils and the officers claim that Ohio law gave them a right to record the interviews. The source of that authority, they say, is Ohio Revised Code § 2933.52. But the statute criminalizes interceptions of oral, wire, and electronic communications unless the interceptor "is a party to the communication or if one of the parties to the communication has given the person prior consent to the interception." *Id.* § 2933.52(B)(4). That Ohio has chosen not to criminalize certain conduct does not mean that it has permitted it.

We affirm.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 22-3224

DANIEL HILS; CHARLES KNAPP; KEN BYRNE; ADARRYL BURCH,

    Plaintiffs - Appellants,

v.

GABRIEL DAVIS, DIRECTOR, City of Cincinnati Citizen Complaint Authority, and IKECHUKWU EKEKE, Investigator, City of Cincinnati Citizen Complaint Authority, in their official and individual capacities; CITY OF CINCINNATI,

    Defendants - Appellees.

**FILED**
Nov 07, 2022
DEBORAH S. HUNT, Clerk

Before: SUTTON, Chief Judge; DONALD and MURPHY, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Southern District of Ohio at Cincinnati.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the judgment of the district court is AFFIRMED.

**ENTERED BY ORDER OF THE COURT**

Deborah S. Hunt, Clerk